314 S.W.3d 319 (2010)
A.C., a Minor, Appellant,
v.
COMMONWEALTH of Kentucky, Appellee.
No. 2009-CA-000714-ME.
Court of Appeals of Kentucky.
June 4, 2010.
*320 Rebecca Hobbs, Gail Robinson (argued), Frankfort, KY, for appellant.
Jack Conway, Attorney General, Ken W. Riggs (argued), Assistant Attorney General, Frankfort, KY, for appellee.
Before CAPERTON and MOORE, Judges; BUCKINGHAM,[1] Senior Judge.

OPINION AND ORDER
MOORE, Judge.
A.C., a female child, appeals the order of the Jessamine Family Court finding her in contempt of court and ordering her to be *321 detained until placed in a home by the Cabinet for Health and Family Services (Cabinet), Department for Community Based Services (DCBS), but for no more than thirty days. The Commonwealth of Kentucky moves to dismiss the appeal on the basis that it is moot because A.C. has been released from the DCBS's commitment. After a careful review of the record, we vacate the family court's order because it is beyond dispute that A.C.'s probation period expired before the court found her in violation of a valid court order, i.e., a juvenile probation violation. We deny the Commonwealth's motion to dismiss because the issues involved in this appeal are not moot.
The unfortunate circumstances that have intertwined and culminated in the appeal before us began in June 2007, when a juvenile complaint was filed against A.C., contending that she was "beyond control of [her] parent," specifically, her mother. According to the "Preliminary Inquiry Formal/Informal Processing Criteria and Recommendations" filed in the record on June 11, 2007, A.C. "requested a Formal Court Hearing." Also listed on the form is that "[t]he case is not appropriate for Informal Processing, it is recommended that this case be referred to court for a formal hearing or formal adjustment."
Pursuant to KRS[2] 610.080,
Juvenile proceedings shall consist of two (2) distinct hearings, an adjudication and a disposition, which shall be held on separate days unless the child, after consultation with an attorney, waives the right to formal predisposition investigation report and moves that the hearings be held the same day. However, if the disposition is to be commitment, the child's waiver shall not be valid without the consent of the Department of Juvenile Justice or the cabinet.
(1) The adjudication shall determine the truth or falsity of the allegations in the petition and shall be made on the basis of an admission or confession of the child to the court or by the taking of evidence.
(Emphasis added).
Pursuant to KRS 610.070,
(1) All cases involving children brought before the court whose cases are under the jurisdiction of the court shall be granted a speedy hearing and shall be dealt with by the court without a jury.
(2) The hearings shall be conducted in a formal manner, unless specified to the contrary by other provisions of KRS Chapters 600 to 645.
On June 28, 2007, a "proceeding" took place in the family court. Evidence was not taken, and the record does not reflect that A.C. admitted to the charge of being beyond control, in violation of KRS 610.080. Nonetheless, on appeal, A.C.'s counsel states that "it is possible, based upon the comprehensive order entered by the family court judge on June 28, 2007, that an agreement was reached between the County Attorney and defense counsel. Likewise, since a predisposition investigation report (PDI) was never submitted by the Cabinet for Health and Family Services (Cabinet), nor was a separate disposition hearing held, the agreement was likely intended to be an admission to the charge in exchange for the order of a one (1) year probation period." With due candor to the Court, the Commonwealth at oral argument before this Court conceded that it cannot explain the silent record and proceedings.
This Court has said frequently that the court speaks only by its written record. *322 Holland v. Holland, 290 S.W.3d 671, 675 (Ky.App.2009). The present case illustrates why this is imperative. Despite the silent written record, nothing the family court stated on the record leads to the conclusion that A.C. actually admitted to the status offense. Given the numerous other irregularities in this case, it is just as possible that no agreement was in fact made. Nonetheless, even assuming that A.C. had admitted to the charge brought against her, the family court had the obligation to hold a hearing under Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). See D.R. v. Commonwealth, 64 S.W.3d 292 (Ky.App.2001), as applied and analyzed in J.D. v. Commonwealth, 211 S.W.3d 60, 62-63 (Ky.App. 2006),

Boykin is the seminal case in the arena of the validity of a guilty plea. In Boykin, the U.S. Supreme Court stated that "[s]everal federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial.... We cannot presume a waiver of these [] important federal rights from a silent record." [Boykin] 395 U.S. at 243, 89 S.Ct. 1709. The Supreme Court ultimately held that the trial court committed error when it "accept[ed] petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary." Id. at 242, 89 S.Ct. 1709. In D.R., this Court stated that "it [is] beyond controversy that Boykin [] applies to juvenile adjudications." 64 S.W.3d at 294, FN2. The D.R. court went on to state that:
The validity of a guilty plea must be determined not from specific key words uttered at the time the plea was taken, but from considering the totality of circumstances surrounding the plea.... These circumstances include the accused's demeanor, background and experience, and whether the record reveals that the plea was voluntarily made.

Id. at 294.
The Sixth Circuit Court of Appeals has also weighed in on this issue in a federal case arising out of the Western District of Kentucky, for which the juvenile had counsel. In Laswell v. Frey, 45 F.3d 1011, 1015 (6th Cir.1995), the court stated:
Upon review, this Court notes that an adjudication demands a determination of the truth or falsity of the allegations, and that a determination of the truth requires more than the simple verbal admission at the detention hearing at issue in the instant case. The Court is persuaded that, because no inquiry was made of the veracity of the charges or admission, because no inquiry was made to determine if "the plea" was voluntarily made, and because no inquiry was made as to the nature of the charges, that the proceedings cannot later be transformed from a determination of probable cause for detention into an acceptance of a valid guilty plea.
Our review of the record reveals that the district court explained J.D.'s Boykin rights to him only during the August detention hearing related to the terroristic threatening charge. However, the district court did not specifically review these rights in the context of his decision to admit to both the terroristic threatening and assault charges the following month. In fact, J.D. had never been apprised of his Boykin rights in relation to either the assault or beyond control charges. Thus, there is no evidence in the record to establish that his admission to the charges was voluntary and intelligent at the time it was entered. The situation in this case is quite similar to those of D.R. and Laswell, *323 although J.D. was represented by counsel, unlike D.R. in his case.
The record in the present case shows that under any test, the bare minimum for compliance with Boykin was not met. We recognize that juvenile proceedings are by nature less formal than adult proceedings; and we are aware of the great number of cases most district judges handle. However, juvenile adjudication proceedings must meet constitutional muster, and this one does not. There was no colloquy whatsoever; and from the record it appears that the juvenile's attorney responded to the district judge's questions at the adjudication. Under KRS 610.080(1), "[t]he adjudication shall determine the truth or falsity of the allegations in the petition and shall be made on the basis of an admission or confession of the child to the court or by the taking of evidence." (Emphasis added).
Based upon binding precedent, we must hold that the district court improperly accepted J.D.'s admission of guilt without first informing him of his Boykin rights at the time it accepted the plea, a step necessary to establishing that his plea was voluntary and intelligent. Accordingly, the district court should have granted J.D.'s motion to set aside the adjudication and disposition. The circuit court, in turn, committed reversible error in affirming the district court's ruling.
(J.D. v. Commonwealth, 211 S.W.3d at 62-63)(underline added; internal notes omitted).
Despite the generous interpretation given by A.C.'s counsel on appeal of what actually took place at the proceeding on June 28, 2007, without a Boykin procedure, even an admission to the status offense could not have passed constitutional muster pursuant to J.D. Nonetheless, on that same day, the written record reflects that the family court entered a "Juvenile Status Offender Order" and found that A.C. was a status offender because she was beyond the reasonable control of her parents pursuant to KRS 600.020. The court ordered A.C. to: not leave her home without custodial permission; obey all rules of her home; attend all school sessions on time, have no unexcused absences and no behavior problems at school; not violate the law; maintain at least passing grades in school; and not consume, use, or possess any alcoholic beverages, tobacco products or illegal drugs. The court further ordered A.C. to serve one year of probation and undergo a mental health assessment, which was conducted. And, the court entered a pre-authorized pick up order for A.C., stating to her that if she violated the terms of her probation, she would be taken to jail and the court would not have to be bothered while "sleeping in bed" at night to sign any orders in regard to her. Unfortunately for A.C., this order was not timely appealed although the proceedings ignored constitutional and statutory mandates for juvenile proceedings. Accordingly, we are without jurisdiction to reverse this order. See Kentucky Rule(s) of Civil Procedure (CR) 73.02(1)(a).
While A.C. was serving her probationary period, which was to end on June 28, 2008, a dependency, neglect and abuse (DNA) petition was filed concerning A.C. in March of 2008.[3] The DNA petition stated that there were allegations of physical abuse, emotional abuse, and neglect by A.C.'s mother and stepfather toward A.C. During one of the early proceedings in the *324 DNA case, the stepfather stated that "either [A.C.] goes or he goes (from home)." The court specifically asked A.C.'s mother, in the presence of A.C., who she was going to choose. Although A.C.'s mother tried to explain that the family needed help to remain intact, the court asked her to make the choice of either her husband or her daughter despite the fact that A.C. had lived with her mother and stepfather for eleven years. When A.C.'s mother did not make a clear choice, the court entered an order directing A.C. to be placed with her father. A.C. was directed to have no contact with her stepfather, but she was permitted to have supervised visits with her mother. From statements made on the videotapes of subsequent proceedings, A.C.'s mother was only able to have very little visitation with A.C., and A.C. had no visitation with her stepfather, although she expressed a desire to do so.
An adjudication hearing was held in the DNA case. A.C. recanted an earlier statement she had made that her stepfather had hit her one time but did acknowledge that he raised his hand as if he might hit her. A.C.'s testimony included that she wanted to go back home with her mother and stepfather because she had lived with them for eleven years but knew they needed parenting help. A.C.'s mother was again questioned regarding why she had chosen her husband over her daughter and again she stated she was just trying to keep her family together. The court held the mother to her "choice."
In the adjudication order, the court found A.C. to be neglected and abused, finding specifically that
[A.C.] attempts to recant her earlier statements, unpersuasively. She [sic] explainations [sic] for the change are internally [and] externally inconsistent [with] other facts. She has been abused and continues to be at riskmother is unable or unwilling to protect her.
A.C. remained in the custody of her father. She only had supervised visits with her mother, and apparently no contact with her stepfather.
In September 2008, a dispositional hearing was held in the DNA case. Most of the audio of the videotaped proceedings is inaudible, and the record scarcely records what occurred. The order entered on September 25, 2008, in the DNA action called it a "close case," which we assume was supposed to read "closed case." The written order also provides "diversion for Mr. Corman's informational purposes." There is no explanation of what this means.
The DNA case was therefore closed in September of 2008 and A.C.'s probation on the status offense ended in June of 2008, disposing of that matter. At oral argument before this Court, A.C.'s counsel argued that upon the final disposition of the DNA case and the status offense case, there was no longer an open case over which the family court could exercise particular case jurisdiction. The Commonwealth conceded that both cases were closed and that with these two cases closed, there is not a pending open case in family court regarding A.C.
Despite the fact that there are no longer any pending cases against A.C., in March 2009 a summons was issued in the DNA action, in which the father was ordered to appear and bring A.C. to court. The Cabinet also filed a "motion to review," in which the case worker requested that the case "be brought before the court for status review." The case worker wrote in the motion as follows: "There have been some behavior problems in school and at home. [A.C.] is currently living with her grandmother but father still retains custody. This worker believes it would be in her best interest to review her case status with *325 the court." Although no case number was specified on this "motion to review," the motion was filed as part of the record in the DNA action.
The Cabinet's "motion to review" was heard by the family court. But rather than focusing on the DNA action, the proceedings focused on a contempt charge against A.C. for the alleged violations of her probation, despite the fact that her probationary period had expired on June 28, 2008. A.C. received no notice until she appeared in court that she was there for a proceeding regarding violation of a court order or her probation terms.
A.C. was with her grandmother; A.C.'s mother was in California at the time of the hearing. It is unclear from the record under what statutory authority the court held the proceedings. At oral argument before this Court, neither A.C.'s attorney nor the Commonwealth could identify under what authority the family court assumed particular case jurisdiction.
Adding further insult to this untenable situation, at the "proceeding" the family court heard more than five minutes of arguments from the Cabinet, the County Attorney, the Guardian Ad Litem (GAL), and the attorneys for both of A.C.'s parents concerning A.C.'s allegedly bad behavior without A.C.'s appointed counsel being present for those arguments. A.C. stood without counsel, with only her grandmother at her side.
Much of the audio from the proceedings is difficult to understand, but it appears that unidentified persons speaking alluded to allegations that A.C. and a sibling had made against A.C.'s father regarding physical abuse. However, the record before this Court contains no such allegations or petitions filed against the father. The father's attorney stated that the father was fearful regarding what allegations A.C. might make in the future. The GAL stated that A.C. has said things against her father that proved to be unsubstantiated, but the record before this Court does not bear that. This Court attempted to clarify this at oral argument, but neither attorney was aware of a written petition filed in regard to these allegations. And, again, in the presence of A.C., the family court noted that her mother had chosen her husband over A.C. When discussing where A.C. should be placed, the court stated that the mother was out of the question because she had made her election of her husband over A.C. The court stated directly to A.C. that she had "probably played [her] last card." A.C. requested to speak but her request was denied by the court. In response, the court stated that A.C. should go out in the hall and talk to her lawyer. A break was taken for A.C. to do so.
After A.C. had an opportunity to speak with her attorney, the attorney pointed out to the court that no evidence had been taken on any of the alleged violations of A.C.'s probation.[4] A.C.'s attorney also pointed out that, although the Cabinet believed there was no discipline in A.C.'s grandmother's home, no evidence had been taken on that issue or whether A.C. was actually doing better while she was living with her grandmother. Additionally, A.C. made no admission to the allegations against her.
Despite that in its DNA adjudication order of May 7, 2008, the family court (1) specifically found A.C. to have been abused and neglected, and (2) found that A.C.'s attempts to recant her statements that her stepfather had hit her one time were "internally and externally inconsistent," at *326 the March 2009 proceeding the court stated in A.C.'s presence that she had found a way to manipulate her stepfather and in essence wanted to use those same methods against her father. The court also stated that A.C. had found a way to make it "jump," referencing her statements regarding the petition in the earlier DNA action. The court further stated that A.C. had learned how to manipulate with lies and tears and sometimes had "pulled [its] strings, but this time it's not." Thereafter, the court stated directly to A.C. and in reference to her that "[its] heart was stone."
The family court then revoked A.C.'s probation on the spot, ordering her to "[r]emain detained until placement by DCBS not to exceed 30 days." She was immediately taken out of the courtroom and detained despite flagrant due process violations; the fact that no evidence was taken nor was there an admission to the alleged violations; the expiration of her probationary period; and the court's failure to provide a written explanation of the evidence it relied upon. On the form titled "Juvenile Status Or Delinquency Disposition," under the findings of fact and conclusions of law section, the court merely wrote that A.C. was found to be in "violation of VCO [Valid Court Order]," yet there was in fact no valid court order at the time for A.C. to have violated. The court adopted recommendations from a dispositional report. We assume that the "dispositional report" to which the court was referring was the juvenile probation violation that was included in the record and filed on the same day that the disposition was entered. According to that juvenile probation violation form, the violations A.C. had committed were as follows: (1) she missed several days of school; (2) she left her father's care and did not have contact with him for two weeks and she changed schools; and (3) she had not been following the rules in her father's home. As noted, no evidence was taken on these allegations, and A.C. did not admit to them. Remarkably, it was not explained nor explored how a fifteen-year-old was able to switch schools without adult assistance or permission.
Turning to the issue of A.C.'s detainment after the March 2009 proceedings, we first consider the Commonwealth's claim that the appeal should be dismissed as moot. In support of its motion, the Commonwealth attached a letter from the Cabinet stating that A.C. had "been released from commitment to the Cabinet.... As of 11/19/09 [A.C.] is in the custody of her sister.... Please see the attached Court order." The court order to which the Cabinet was referring was a docket sheet with the status offense case number at the top, and at the bottom, the following handwritten notes: "(1) DCBS commitment ends[;] (2) custody to [A.C.'s sister;] (3) Dec. 17, [20]09 review[; and] (4) support to be paid to custodian."
A.C. included with her response in opposition to the Commonwealth's motion to dismiss a letter from the same Cabinet worker clarifying that A.C. had
been released from commitment to the Cabinet.... As of 11/19/09 [A.C.] is in the custody of her sister.... According to our records [A.C.] was probated to the Court and the Court requested DCBS to supervise that probation [on] 1/17/2008. It is unknown whether or not an end date was given for the probation. To the knowledge of this agency, [A.C.'s] status offense remains under review of the Court. The next review date in Jessamine Co. Family Court is scheduled for 12/17/09.
The Commonwealth concedes that there is no actual case before the family court in regard to A.C. and, therefore, no particular *327 case jurisdiction, yet the family court continues to hold status review hearings.
There typically must be an actual controversy in a case before a court will review the issues involved in the case. If no such controversy exists, the case is rendered moot. However, a court will review even a moot case if the issues involved in the case are "capable of repetition, yet evading review." Philpot v. Patton, 837 S.W.2d 491, 493 (Ky.1992) (internal quotation marks omitted).
The decision whether to apply [this] exception to the mootness doctrine basically involves two questions: whether (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration and [2] there is a reasonable expectation that the same complaining party would be subject to the same action again.
Id. (internal quotation marks omitted).
In the present case A.C.'s status offensealthough her probation period has long since passedis still being subjected to review and, in fact, a review hearing was scheduled at that time for December 17, 2009. Thus, because a status offense review hearing was scheduled by the family court and the court was necessarily proceeding, as was the Cabinet, under the erroneous assumption that the court retained jurisdiction over A.C.'s status offense, and that her period of probation had not expired, this Court will review this issue.
A.C. was released from the Cabinet's commitment because she had served her maximum of thirty days of detention. However, thirty days is too short a period of time for the propriety of the commitment to be fully litigated prior to its cessation. Additionally, the Cabinet and the family court continue to hold review hearings concerning A.C.'s status offense, so there is a reasonable expectation that A.C., who is still a minor, may again be detained by the Cabinet, particularly given the flawed history of the proceedings in this case. Therefore, this case meets the exception to the mootness doctrine. Accordingly, the Commonwealth's motion to dismiss this appeal as moot is denied.
In its appellate brief, the Commonwealth also asserts that this Court should not review any issues pertaining to A.C.'s commitment to the Cabinet pursuant to the doctrine of invited error. The Kentucky Supreme Court has held as follows:
Although most criminal cases addressing the issue of invited error do so in the context of a criminal defendant's waiver of his right to a jury trial, ... the rationale behind the notion that one cannot commit to an act (such as waiving a jury trial) and later complain on appeal that the trial court erred to his detriment is equally applicable when a criminal defendant fails to act (such as foregoing the opportunity to question a witness).... A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where ... it is not clear that the defendant was prejudiced thereby.
Gray v. Commonwealth, 203 S.W.3d 679, 686 (Ky.2006) (internal quotation marks omitted).
The doctrine of invited error does not apply to the present case. A.C.'s due process rights were violated. And, nothing in the record supports that A.C. knowingly and voluntarily waived any of her rights. In fact, the only time she was even permitted to speak was during her testimony in the DNA case. When she asked to speak at the "contempt" proceedings, she was not permitted to do so. Nothing in the record reflects that the family court conducted any colloquies into whether she intended to waive any of her constitutional *328 rights. These were not errors that she invited by knowingly waiving her constitutional rights. She certainly did not benefit from any of the errors; rather, she suffered from them on more than one occasion, including spending thirty days in detention. These were errors that occurred through no fault of A.C.'s. In fact, she was brought into court regarding the DNA action, then she was essentially blindsided by the Commonwealth and the court with the charge of contempt in the status offense action. Therefore, the Commonwealth's allegation that the doctrine of invited error applies to this case lacks merit.
Moving to the contents of A.C.'s arguments before this Court, A.C. acknowledges in her appellate brief that her issues are not preserved. However, she contends that we should review it for palpable error. We agree.
Kentucky Rule(s) of Criminal Procedure (RCr) 10.26 provides as follows: "A palpable error which affects the substantial rights of a party may be considered ... by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Because of the numerous due process violations A.C. suffered, we will review this issue.
Certain due process requirements must be met before a defendant's probation may be revoked. "Although the State has a great interest in reincarcerating those individuals who are unable to meet the conditions of their probation, it may not do so without first affording an individual the minimum requirements of due process." Robinson v. Commonwealth, 86 S.W.3d 54, 56 (Ky.App.2002).
[T]hese requirements include: (a) written notice of the claimed violations of [probation]; (b) disclosure to the [probationer] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation].
Robinson, 86 S.W.3d at 56 (internal quotation marks omitted).
In Commonwealth v. B.J., 241 S.W.3d 324 (Ky.2007), the Kentucky Supreme Court noted that status offenses "are neither criminal nor delinquent." B.J., 241 S.W.3d at 327. The Court continued, noting that proceedings against a child for a status offense may
result in severe consequences to that child. T.D. v. Commonwealth, 165 S.W.3d 480, 483 (Ky.App.2005).
In light of these potentially severe consequences to the child, due process must be afforded, despite the non-criminal nature of juvenile proceedings. [W]here the fault of the child is at issue and penalties, including loss of liberty, may attach, criminal protections provided by the constitution apply. Id.

B.J., 241 S.W.3d at 327 (internal quotation marks omitted).
In Q.C. v. Commonwealth, 164 S.W.3d 515 (Ky.App.2005), a juvenile's probation was revoked, and this Court held that "due process required the Commonwealth to serve him with written notice which set forth the specific grounds that constitute the alleged probation violation." Q.C., 164 S.W.3d at 517. The Court continued, noting that if "the Commonwealth fails to give *329 adequate written notice, then the lack of proper notice may be a ground for reversal." Id.
In the present case, A.C. was not provided written notice of the specific grounds constituting her alleged probation violation prior to appearing in court. Furthermore, pursuant to KRS 610.265(3)(d) and KRS 610.060(2)(a), the court erred when it heard arguments from the Cabinet, the County Attorney, the GAL, and the attorneys for A.C.'s parents for more than five minutes during the hearing without A.C.'s counsel being present to represent her. However, A.C. was given the opportunity to speak with her attorney prior to the family court finding her in contempt for violating the terms of her probation. Nonetheless, no evidence was taken on the alleged violations, and A.C. did not admit to them. The family court also failed to provide a written statement as to the "evidence" it relied upon in support of its finding of contempt and its decision to revoke her probation. Accordingly, the proceeding which led to A.C.'s detention was replete with due process violations.
We agree with A.C. that the order of March 12, 2009, must be vacated because the family court had no jurisdiction to hold her in contempt once the 2007 status offense action expired pursuant to the terms of A.C.'s probation.
The Commonwealth contends that, pursuant to KRS 620.025, when the DNA action was filed approximately nine months after the family court entered its June 2007 order in A.C.'s status offense case, the DNA petition acted to suspend all proceedings in the status offense case. We disagree with this interpretation.
Kentucky Revised Statute 620.025, upon which the Commonwealth relies, states:
A finding of jurisdiction under this chapter shall not necessarily preclude a finding of jurisdiction under KRS Chapters 625, 630, or 635; however, jurisdiction under this chapter shall take precedence. No child shall be released from the jurisdiction of the court under this chapter if concurrent complaints under KRS Chapters 630 or 635 are pending.
Although the plain wording of the statute provides that DNA actions take precedence over status offense actions, it does not provide that status offense actions should be suspended upon the initiation of a DNA action, contrary to the Commonwealth's assertion. Furthermore, the Commonwealth has cited no other authority in support of this assertion.
Although there is no statutory merit to the Commonwealth's argument, it would not apply in this situation assuming we agreed with it. By the time the petition in the DNA was filed, A.C. had already been on probation from June 2007 to March 2008; this is approximately nine months, leaving her with three months left to serve. The DNA case was closed in September 2008. So, even if we agreed which we do notwith the Commonwealth's theory, A.C.'s probation expired at the latest in December 2008, well before the March 2009 "motion to review." Therefore, the Commonwealth's argument lacks all merit.
Accordingly, the Commonwealth's motion to dismiss this appeal is denied. Additionally, the order of the Jessamine Family Court finding that A.C. violated its June 2007 status offender order is vacated. This matter is remanded to the family court with instructions that case no. 07-J-211-001 be closed and discharged.
The Court is aware that family courts have heavy dockets and that the juvenile portion of their dockets may take a great deal of those courts' time and energy. However, juvenile proceedings *330 must meet constitutional muster. J.D., 211 S.W.3d at 63. This one did not.
The Court notes that a review of the proceedings in this matter reveals an apparent dysfunctional family and a child in need of assistance. The purpose of juvenile proceedings is to assist the child and the family, not to employ methods that further break down the family unit. In this case, A.C.'s mother was called on to make a choice between her child and her husband in the presence of the child, while asking for assistance to keep the family unit together. And, although the family court had found A.C. to be an abused and neglected child, the court later used her allegations of abuse to reference that she had learned to manipulate the court and stated that the court's "heart is stone" in reference to her. Certainly, A.C. has troubles, but a family and child in trouble should not be further torn apart by the system that is in place to provide stability and reunification.
ALL CONCUR.
NOTES
[1] Senior Judge David C. Buckingham, sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.
[2] Kentucky Revised Statute(s).
[3] The DNA petition was originally filed under the status offense case number, 07-J-211-001, but the case number for the DNA case subsequently changed in the record to 07-J-211-002.
[4] Remarkably, although the record is clear that nothing extended A.C.'s probation beyond June 2008, no one noted it during the proceedings.